**Electronically Filed
Intermediate Court of Appeals
CAAP-22-0000247
14-FEB-2023
09:47 AM
Dkt. 88 MO**

NO. CAAP-22-0000247

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI

IN THE INTEREST OF SO AND E CHILDREN

APPEAL FROM THE FAMILY COURT OF THE FIRST CIRCUIT
(FC-S NO. 20-00053)

MEMORANDUM OPINION
(By: Ginoza, C.J., and Leonard and Wadsworth, JJ.)

Appellant/Cross-Appellee Father (**Father**) and
Appellee/Cross-Appellant Mother (**Mother**) (together, **Parents**)
appeal from the Order Terminating Parental Rights (**TPR Order**)[1]
and Letters of Permanent Custody, entered on March 29, 2022, in
the Family Court of the First Circuit (**Family Court**),[2]
terminating Mother's and Father's parental rights to SO, JE, RE,
and DE (the **Children**).[3]  On May 5, 2022, the Family Court entered
Findings of Fact and Conclusions of Law regarding the TPR Order.

We construe Mother and Father's respective opening
briefs as asserting the following contentions:  (1)
Appellee/Cross-Appellee Department of Human Services (**DHS**) failed
to make reasonable efforts to reunify Mother and Father with the
Children, and thus the Family Court erred in finding there was

---

[1]  On April 8, 2022, the Family Court entered an amended TPR Order
and Amended Letters of Permanent Custody reflecting non-substantive clerical
changes.

[2]  The Honorable Andrew T. Park presided.

[3]  Mother is the natural and legal mother of the Children.  Father is
the legal father of JE and RE and the adjudicated father of DE.  SO's legal
father did not participate in the underlying proceeding or on appeal.

clear and convincing evidence that Mother and Father were not willing and able to provide a safe family home, even with the assistance of a service plan, now or within a reasonable period of time, pursuant to Hawaii Revised Statutes (**HRS**) § 587A-33(a)(1) and (2) (2018)[4]; and (2) the Permanent Plan dated October 11, 2021 was not in the Children's best interests, pursuant to HRS § 587A-33(a)(3) (2018).[5]

---

[4]      HRS § 587A-33 provides, in relevant part:

>        (a) At a termination of parental rights hearing, the court shall determine whether there exists clear and convincing evidence that:

>> (1)    A child's parent whose rights are subject to termination is not presently willing and able to provide the parent's child with a safe family home, even with the assistance of a service plan;

>> (2)    It is not reasonably foreseeable that the child's parent whose rights are subject to termination will become willing and able to provide the child with a safe family home, even with the assistance of a service plan, within a reasonable period of time, which shall not exceed two years from the child's date of entry into foster care;

>> (3)    The proposed permanent plan is in the best interests of the child.  In reaching this determination, the court shall:

>>> (A)    Presume that it is in the best interests of the child to be promptly and permanently placed with responsible and competent substitute parents and family in a safe and secure home; and

>>> (B)    Give greater weight to the presumption that the permanent plan is in the child's best interest, the younger the child is upon the child's date of entry into foster care; and

>> (4)    The child consents to the permanent plan if the child is at least fourteen years old, unless the court consults with the child in camera and finds that it is in the best interest of the child to proceed without the child's consent.

[5]     In their respective opening briefs, Mother and Father identify (1) the TPR Order, (2) the Letters of Permanent Custody, and (3) their objections to findings of fact (**FOFs**) 71, 110 (identified by Mother), 111 (identified by Father), 137, 155-158, 159 (identified by Mother), 160 (identified by Father), 177-179, and 188-190, and conclusions of law (**COLs**) 6, 7, and 9, as their "points of error," but fail to clearly articulate specific points of error, identify where the error occurred, and identify how each point was preserved for appeal, with appropriate record citations.  See Rules Expediting Child Protective Appeals (**RECPA**) Rule 11(a)(3)(A)-(C).  Additionally, the argument

2

For the reasons discussed below, we vacate the TPR Order and the Letters of Permanent Custody, and remand to the Family Court for further proceedings.

## I. Background

In April 2020, the police transferred custody of the Children to DHS due to safety issues concerning Mother and Father's substance abuse and domestic violence. All of the Children entered into foster care on June 2, 2020. At that time, the Children were the following ages: SO, twelve years; JE, eleven years; RE, 23 months; and DE, ten months.

In June 2020, DHS placed SO and JE into a foster home with a resource caregiver (**RCG**). In June 2021, DHS placed RE and DE in the same home. All four Children resided with RCG from June 2021 until DHS removed SO in February 2022. During this time, a single guardian ad litem, Emily M. Hills (**GAL Hills**), represented the Children. Beginning March 1, 2022, Daniel E. Pollard (**GAL Pollard**) served as guardian ad litem for RE and DE.

In April 2020, the Family Court appointed separate counsel for Mother and Father. In June 2020, the court ordered the DHS service plan outlining tasks for Mother and Father to complete to be reunified with the Children, including: (1) substance abuse assessment and follow through with recommended treatment, (2) random drug screening, (3) domestic violence intervention, (4) parenting education, and (5) a psychological evaluation.

DHS assigned social workers to the case whose work included assisting Mother and Father complete the tasks in the service plan. Michel Tovey (**Tovey**) served as the social worker on the case from May 2020 to February 2021, followed by Maili Taele (**Taele**). DHS, via its social workers, temporarily provided

sections of the opening briefs do not specifically address each point of error, but rather make the same two overarching arguments. See id. Rule 11(a)(4). Although the opening briefs fail to comply in material respects with the RECPA, we have "consistently adhered to the policy of affording litigants the opportunity 'to have their cases heard on the merits, where possible.'" Morgan v. Planning Dep't Cty. of Kauai, 104 Hawaiʻi 173, 180, 86 P.3d 982, 989 (2004) (quoting O'Connor v. Diocese of Honolulu, 77 Hawaiʻi 383, 386, 885 P.2d 361, 364 (1994)). We thus address Parents' arguments and the contested FOFs and COLs to the extent discernible.

Mother and Father with a cell phone and gave them bus passes. DHS communicated with Mother and Father via in-person meetings, telephone calls, emails, and text messaging.

On November 16, 2021, after minimal progress on the service plan, DHS filed a motion to terminate parental rights (**TPR Motion**).  Attached to the TPR Motion was a Safe Family Home Report and Permanent Plan, both dated October 11, 2021.  The Permanent Plan, among other things, described the Children's current and permanent placement as being with RCG.  DHS described "age-appropriate permanent plan discussions" with SO and JE, in which they both stated that they wished to remain in RCG's home and felt safe and stable there.  DHS provided the following assessment and recommendation:

> DHS believes that permanent custody of [SO], [JE], [RE] and [DE] is in their [sic] best interest of the children.  RCG is non-relative resource caregiver that has formed close bonds with the children and provided them with a safe and stable home.  [SO] and [JE] have been in RCG's care since 06/15/2020.  [RE] and [DE] was [sic] placed in RCG's home since 06/03/2021.  RCG is willing to provide a Forever home for the four children despite the difficulties of raising four children as a single parent.

> DHS believes that permanent custody with the goal of adoption of the [Children] be granted.

On October 12, 2021, SO consented to the Permanent Plan.

On December 14, 2021, GAL Hills filed a report to the Family Court that stated in part, "there is an issue with the current permanent plan for the children and the stability of the children's current placement."  GAL Hills expressed concerns about the Children's placement with RCG, noting tensions between RCG and SO and JE, RCG's ambivalence about adopting the Children, and RCG's inability to provide the Children with additional support due to the demands of her job and so many children.  GAL Hills stated that as a result of her concerns, she had asked DHS to explore other placement options for some of the Children.  GAL Hills also reported her concern that the best interests of the older Children, SO and JE, were diverging from those of the younger Children, RE and DE.

Ultimately, GAL Hills recommended that the Family Court (1) continue foster custody, (2) order DHS to explore non-

4

relative placement options for the Children, and (3) continue the TPR Motion to give DHS time to explore alternative placement options.

On December 21, 2021, DHS submitted a Supplemental Safe Family Home Report to the Court, raising concerns similar to GAL Hills's, but concluding that, with financial assistance, RCG could provide the Children with a permanent home.

At a December 21, 2021 hearing, the Family Court spoke with SO and JE regarding placement issues, and later acknowledged that "there may be a need to split the kids up" and "some kids are going to have to change placement . . . ." To address potential conflicts of interest between the Children, the Family Court ordered that GAL Pollard be appointed to represent RE and DE, and scheduled trial on the TPR Motion.

At trial, the Family Court heard testimony from Taele, Tovey, Mother, and Father regarding Mother's and Father's progress on the service plan and DHS's efforts to assist them. Taele testified, among other things, that "[a]t the time that we did the permanent plan the goal was to have them be adopted by [RCG]."

At the end of trial, the Family Court found that (1) Mother and Father were unable to provide a safe family home for the Children, (2) it was not reasonably foreseeable that they would become willing and able to provide the Children with a safe family home within a reasonable period of time, and (3) the Permanent Plan was in the best interests of the Children.

## II. Standards of Review

"Generally, the family court possesses wide discretion in making its decisions and those decisions will not be set aside unless there is a manifest abuse of discretion." In re Doe, 95 Hawaiʻi 183, 189, 20 P.3d 616, 622 (2001) (internal quotation marks omitted) (quoting In re Doe, 84 Hawaiʻi 41, 46, 928 P.2d 883, 888 (1996)).

We review Parents' challenges to the Family Court's FOFs for clear error. Doe, 95 Hawaiʻi at 190, 20 P.3d at 623.

> A FOF "is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made." "'Substantial evidence' is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion."

Id. (citations and ellipsis omitted).

We likewise review conclusions of law that present mixed questions of fact and law for clear error. See In re JM, 150 Hawaiʻi 125, 137, 497 P.3d 140, 152 (App. 2021). Accordingly:

> The family court's determinations . . . with respect to (1) whether a child's parent is willing and able to provide a safe family home for the child and (2) whether it is reasonably foreseeable that a child's parent will become willing and able to provide a safe family home within a reasonable period of time present mixed questions of law and fact; . . . they are reviewed on appeal under the clearly erroneous standard. Likewise, the family court's determination of what is or is not in a child's best interests is reviewed on appeal for clear error.

Id. (brackets omitted) (quoting Doe, 95 Hawaiʻi at 190, 20 P.3d at 623).

### III. Discussion

### A. Whether DHS Made Reasonable Efforts Toward Reunification

Mother and Father appear to contend that DHS failed to make reasonable efforts to reunify them with the Children, and thus the Family Court erred in finding there was clear and convincing evidence that Parents were not willing and able to provide a safe family home, even with the assistance of a service plan, now or within a reasonable period of time. In support of this contention: (1) Mother and Father assert that DHS failed to assist them with obtaining a cell phone; (2) Mother asserts that DHS failed to assist her in obtaining counseling and housing, and failed to provide visits with the Children at her residence once she obtained housing; (3) Father asserts that DHS failed to monitor Mother's and Father's progress in services through monthly home visits; (4) Mother and Father assert that DHS failed to make reasonable efforts to obtain Mother's consent to release

6

records from Malama Recovery Services; and (5) Mother and Father assert that DHS failed to continue trial in light of recent substance abuse assessments and active efforts to get into residential treatment programs. Mother's and Father's objections to FOFs 71, 110, 111, 137, 155-59, and 177-79, and COLS 6 and 7, appear to relate to their argument.

We address Mother's and Father's assertions, followed by the related FOFs and COLs.

(1) Mother and Father cite no authority, and we find none, requiring DHS to assist them in obtaining a cell phone. Nonetheless, the record establishes that DHS provided Mother and Father with a prepaid phone for a time. Moreover, it appears that Mother and Father had access to a phone and/or computer at times during the pendency of the case. Taele and Tovey communicated with Mother and Father via telephone, text message, and email. Mother called and searched the Internet for shelters to locate her and Father's current residence and obtain a substance abuse assessment on her own. During trial, Mother called counsel to report that she and Father were running late.

Additionally, the record reflects that Mother and Father's failure to complete services was due to inconsistent participation, not the lack of a phone. GAL Hills noted that Mother and Father had participated in certain services notwithstanding the lack of a phone. Father testified to not engaging in services at times due to being rebellious. Mother testified to not engaging in services because she did not want to do what DHS told her to do, she was irresponsible, she felt embarrassed to borrow a phone or to call Taele, and at times, gave up.

(2) Mother does not cite to where in the record she requested and DHS failed to assist her in obtaining counseling or housing, or in holding visits at her residence. See RECPA Rule 11(a)(3)(B); HRAP Rule 28(b)(4). In any event, the record reflects that DHS repeatedly referred Mother and Father to various counseling and therapy services, and attempted to assist Mother and Father locate housing. The record further reflects that DHS organized visitation with the Children throughout the

proceeding. Mother cites no authority that required DHS to change the location of visitation at Mother's request after she obtained housing or that it was unreasonable for DHS not to do so in these circumstances.

(3) Father does not cite, and the record does not contain, substantial evidence showing that monthly home visits were required to monitor Mother's and Father's progress in services. Father cites to portions of the record that list monthly home visits as one way DHS could monitor Mother and Father's progress. But other alternatives included "telephone contact, etc."

At trial, Taele testified that she focused on email and text message communication with Mother and Father to avoid in-person conflicts, and the record also reflects that DHS engaged in in-person and telephone contact with Parents. Regular home visits can be an important part of DHS's responsibilities to assess home placement for children, but here, DHS's alleged failure to conduct monthly visits does not provide substantial evidence that DHS failed to make reasonable efforts to reunify Mother and Father with the Children.

(4) Malama Recovery Services is an outside substance abuse treatment provider. DHS was not legally obligated to obtain services for Mother from an outside provider. Cf. In re Doe, 100 Hawaiʻi 335, 345, 60 P.3d 285, 295 (2002) (holding that it was not reasonable to expect DHS to provide services to an incarcerated parent beyond what was available within the corrections system). Nonetheless, the record establishes that DHS was willing to work with Malama Recovery Services if Mother provided medical consent, and that DHS tried to obtain such consent.

(5) During mediation, all parties agreed to continue trial if Mother and Father entered residential substance abuse treatment before trial. As of March 29, 2022, however, neither Mother nor Father was actually engaged in such treatment. Moreover, Mother and Father's completion of substance abuse assessments was not indicative of imminent entry into residential treatment, as they previously obtained assessments without

8

following through with treatment.  Thus, it was reasonable for DHS to proceed to trial on the TPR Motion.

Next, we address Mother and Father's challenges to FOFs 71, 110, 111, 137, 155-59, and 177-79, and COLS 6 and 7.

FOF 71 provides:

> 71.  Mother and Father are mostly appropriate at visits and the Children appeared bonded to Mother and [Father], but both could benefit with parenting education.

FOF 71 is supported by unchallenged FOFs 38, 43-47, and 58, which provide examples of shortcomings in parenting skills that could benefit from parenting education.  Taele's testimony also supports FOF 71 by describing how the Children's behavioral problems reflect parenting choices.  Thus, the record contains substantial evidence to support FOF 71.

FOFs 110 and 111 provide:

> 110.  Mother did not complete any domestic violence therapy and her safety issues with domestic violence were not resolved.

> 111. [Father] did not complete any domestic violence therapy and his safety issues with domestic violence were not resolved.

FOFs 110 and 111 are supported by unchallenged FOFs 76-109, which detail Mother's and Father's domestic violence issues, DHS's referrals to domestic violence services, and Mother's failure to complete, and Father's failure to begin, domestic violence services.  Thus, the record contains substantial evidence to support FOFs 110 and 111.

FOF 137 provides:

> 137.  Mother and [Father] never started substance abuse treatment in November 2020.

FOF 137 is supported by unchallenged FOFs 112-36 and 138-53, which detail Mother and Father's substance abuse issues, DHS's referrals to substance abuse services, and, notwithstanding completion of substance abuse assessments, Mother and Father's failure to begin substance abuse treatment in November 2020.  Additionally, Mother corroborated FOF 137 with respect to herself, by testifying that she recently completed a substance abuse assessment, but that she "never ever went to treatment in

[her] life." Thus, the record contains substantial evidence to support FOF 137.

FOFs 155-59 provide:

> 155. Despite some setbacks and delays due to the COVID-19 pandemic, Mother and [Father] had ample time to resolve all of their safety issues, but in particular, demonstrate that they could maintain prolonged and sustained sobriety.
>
> 156. Despite some setbacks and delays due to the COVID-19 pandemic, the DHS made reasonable efforts to assist Mother and [Father] in resolving and gave them the reasonable opportunity to resolve their safety issues.
>
> 157. At the time of trial, Mother and [Father] had no anticipated end date for substance abuse treatment and had not resolved their safety issues stemming from ongoing poly-substance abuse.
>
> 158. Because of Mother's and [Father's] consistent failure to engage in and to follow through with substance abuse treatment programs, and their relapses, at the time of the trial, it was not reasonably foreseeable that Mother and [Father] would be able to maintain sobriety over a prolonged period of time.
>
> . . . .
>
> 159. Mother is presently willing but not presently able to provide a safe family home for the children even with the assistance of a service plan due to her failure to resolve her safety issues, failure to complete her domestic violence and substance abuse programming, as well as her unstable housing situation. It is not reasonably foreseeable that Mother will become willing and able to provide the children with a safe family home within a reasonable amount of time, which shall not exceed two years from the children's date of entry into foster care.

FOFs 155-59 are supported by the record. Unchallenged FOFs 72-75 detail Mother and Father's unstable housing situation. Unchallenged FOFs 76-109 detail domestic violence issues between Mother and Father, and DHS's efforts to assist them resolve these issues. Unchallenged FOFs 112-36 and 138-54 describe Mother and Father's inability to maintain sobriety and DHS's efforts to assist them resolve these issues. Testimony of Taele, Tovey, Mother, and Father corroborate the uncontested FOFs by discussing, among other things, referrals to substance abuse services, Mother and Father's failure to follow through with treatment, and Mother and Father's ongoing drug use. Thus, the record contains substantial evidence to support FOFs 155-59.

FOFs 177-79 provide:

>177. Under the circumstances presented by the instant case, the DHS has exerted reasonable and active efforts to avoid foster placement of [the Children].

>178. Under the circumstances presented by the instant case, the DHS has exerted reasonable and active efforts to reunify the Children with Mother and [Father] by identifying necessary, appropriate, and reasonable services to address their identified safety issues, and making the appropriate and timely referrals for these services.

>179. Under the circumstances presented by the instant case, the DHS gave all of the parents every reasonable opportunity to succeed in remedying the problems which subjected the Children to substantial risk of being harmed in the family home, and to reunify with the Children. The DHS actively encouraged Mother and [Father] to participate in necessary and reasonable services to allow them to reunify with the children.

FOFs 177-79 are supported by unchallenged FOFs 72, 76, 89, 97, 112-15, 128, 129, 138, 146, 176, and 180, which detail DHS's efforts to assist Mother and Father complete services to achieve reunification with the Children, including repeated referrals to services, supplying Mother and Father temporarily with a cell phone, and supplying Mother and Father with bus passes. Additionally, Taele's and Tovey's testimony supports FOFs 177-79 by detailing their efforts described in the uncontested FOFs. Thus, the record contains substantial evidence to support FOFs 177-79.

COLs 6 and 7 provide:

>6. The Children's legal mother, legal father, adjudicated, presumed, or concerned natural father, as defined under HRS Chapter 578A, are not presently willing and able to provide the Child [sic] with a safe family home, even with the assistance of a service plan.

>7. It is not reasonably foreseeable that the Children's legal mother, legal father, adjudicated, presumed, or concerned natural father, as defined under HRS Chapter 578A, will become willing and able to provide the Child [sic] with a safe family home, even with the assistance of a service plan, within a reasonable period of time.

COLs 6 and 7 are not clearly erroneous. As discussed above, substantial evidence supports the Family Court's conclusions regarding Mother and Father's inability to provide the Children with a safe family home. Additionally, the Family Court considered the factors set forth in HRS § 587A-7(a) in determining that Mother and Father could not provide the Children

with a safe family home now or in the reasonably foreseeable future. Specifically, the record shows that the Family Court considered at least the following HRS § 587A-7(a) factors: (1) the Children's ages (see FOF 11); (2) harm and threatened harm to the Children (see FOFs 32-51); (3) dates of the Children's out-of-home placement (see FOFs 162-74); (4) the results of psychiatric evaluations of Mother and Father (see FOFs 52-57); (5) abusive or assaultive conduct by Mother and Father (see FOFs 76-109); (6) substance abuse (see FOFs 112-53); (7) completion of services related to assaultive conduct and substance abuse (see FOFs 76-109, 112-53); (8) attempts to locate and involve extended family, specifically SO's legal father (see FOF 7); (9) whether Mother and Father have resolved identified safety issues (see FOFs 110-11, 155-59); and (10) DHS's assessment and recommendation (see FOFs 177-79).

Based on the entire record in this case, including the uncontested FOFs, the testimony presented at trial, and the FOFs we have determined are supported by the record, we conclude that the Family Court did not clearly err in determining there was clear and convincing evidence that: (1) Mother and Father were not presently willing and able to provide the Children with a safe family home, even with the assistance of a service plan; and (2) it is not reasonably foreseeable that Mother and Father will become willing and able to provide the Children with a safe family home, even with the assistance of a service plan, within a reasonable period of time. However, a parent's parental rights cannot be terminated if fewer than all of the requirements of HRS § 587A-33(a) are met. See In re R Children, 145 Hawaiʻi 477, 482-84, 454 P.3d 418, 423-25 (2019). Thus, we must also consider whether clear and convincing evidence established that the Permanent Plan was in the best interests of the Children. See HRS § 587A-33(a)(3). We do so below.

**B.** **Whether the Permanent Plan Was in The Children's Best Interests**

Mother and Father also appear to contend that the Family Court erred in determining that the Permanent Plan was in the Children's best interests. Mother and Father's objections to

FOFs 188-90 and COL 9 appear to relate to this contention.  We address the contested FOFs and COLs in turn below.

FOF 188 provides:

> 188.  <u>The goal of the Permanent Plan is permanent custody of the children with eventual adoption</u> as <u>it is in the best interest of the children</u>, given the children's young age, the children's need for permanency, and the statutory presumption in favor of children being promptly and permanently placed with responsible and competent substitute parents and families in safe and secure homes; the presumption being given greater weight the younger the child's age upon the date of entry into foster care.

(Emphasis added.)

FOF 188 is clearly erroneous because it omits a key component of the Permanent Plan's goal, namely, adoption of the Children by RCG.  The Permanent Plan identifies RCG's home as being the Children's permanent placement.  The Permanent Plan also states that RCG has formed close bonds with the Children, provided a safe and stable home, and is willing to provide the Children with a forever home.  The Permanent Plan does not identify any other presumptive adoptive parent.  Additionally, during trial, Taele testified that "[a]t the time that [DHS] did the permanent plan the goal was to have them be adopted <u>by</u> [RCG]."  (Emphasis added.)  On this record, the Permanent Plan's goal was adoption by RCG.  <u>See</u> <u>Interest of IK</u>, No. CAAP-20-0000737, 2021 WL 4431327, at *10 (Haw. App. Sept. 27, 2021) (mem.) (holding that a permanent plan identifying grandparents and not identifying any other presumptive adoptive parents indicated the plan's goal was adoption by grandparents).

Moreover, to the extent FOF 188 concludes that the Permanent Plan is in the best interests of the Children, it is a mixed finding of fact and conclusion of law that is not supported by clear and convincing evidence.  The record indicates that prior to trial, GAL Hills expressed concerns about the placement of all four Children with RCG, and on December 21, 2021, the Family Court recognized that "there may be a need to split the kids up" and "some kids are going to have to change placement . . . ."  To address potential conflicts of interest between the Children, the Family Court appointed GAL Pollard to represent RE and DE.  Additionally, at trial, Taele testified that "some

13

conflict" had arisen in RCG's home, resulting in SO moving into a shelter and ultimately into a home with a new resource caregiver. Accordingly, given the state of the record, there is no clear and convincing evidence that the Permanent Plan – whose goal was adoption by RCG – is in all of the Children's best interests. Thus, the Family Court clearly erred in FOF 188.

FOF 189 provides:

> 189. Both the children's GALs stated their agreement that the Permanent Plan dated October 11, 2021 with the ultimate goal of adoption is in the children's best interest.

FOF 189 is clearly erroneous. Neither GAL Hills nor GAL Pollard testified at trial, and the record does not appear to reflect that either GAL explicitly stated that the Permanent Plan was in the Children's best interests. Thus, the record lacks substantial evidence to support FOF 189.

FOF 190 provides:

> 190. The DHS social worker, Maili Taele, testified, and the Court finds, that the Permanent Plan dated January 28, 2020 [sic], with the ultimate goal of adoption is in the child's best interest.

FOF 190 is clearly erroneous for three reasons.[6] First, the record does not reflect that Taele explicitly testified that the Permanent Plan was in any of the Children's best interests. As such, FOF 190 is clearly erroneous with respect to Taele. Second, to the extent FOF 190 concludes that the Permanent Plan is in the "child's best interest," it does not identify the child to which it refers. Third, the determination of the child's best interest is a mixed finding of fact and conclusion of law that is clearly erroneous for the same reason as the corresponding conclusion in FOF 188, discussed above.

COL 9 provides:

> 9. The Permanent Plan dated October 11, 2021, with the goal of adoption is in the best interest of the children.

As discussed above regarding FOF 188, the goal of the

---

[6] We note that FOF 190 also appears to contain a typographical error referencing the incorrect date of the Permanent Plan.

Permanent Plan was adoption of the Children by RCG. Given the state of the record, there is no clear and convincing evidence that the Permanent Plan is in all of the Children's best interests. COL 9 is a mixed finding of fact and conclusion of law that is clearly erroneous for the same reason as the corresponding conclusion in FOF 188.

Because we conclude there was no clear and convincing evidence to support the Family Court's determination that the Permanent Plan is in the Children's best interests, not all of the requirements of HRS § 587A-33(a) have been met in this case. Thus, we conclude that the Family Court erred in entering the TPR Order and Letters of Permanent Custody. See In re R Children, 145 Hawaiʻi at 482-84, 454 P.3d at 423-25.

## IV. Conclusion

For the reasons discussed above, the Order Terminating Parental Rights and Letters of Permanent Custody, entered on March 29, 2022, and the Amended Order Terminating Parental Rights and Amended Letters of Permanent Custody, entered on April 8, 2022, in the Family Court of the First Circuit, are vacated. We remand the case to the Family Court for further proceedings and findings, including to address whether the Permanent Plan — or any updated permanent plan — is in all of the Children's best interests and whether Parents' parental rights should be terminated. The Family court may take further action as it deems necessary, including but not limited to addressing any changed circumstances in the case.

DATED: Honolulu, Hawaiʻi, February 14, 2023.

On the briefs:

Jacob G. Delaplane
(Law Office of Jacob G. Delaplane)
  for Appellant/Cross-Appellee Father.

/s/ Lisa M. Ginoza
Chief Judge

/s/ Katherine G. Leonard
Associate Judge

/s/ Clyde J. Wadsworth
Associate Judge

Rebecca S. Lester
  for Appellee/Cross-Appellant
Mother.

Gay M. Tanaka and
Julio C. Herrera,
Deputy Attorneys General,
for Petitioner-Appellee/Cross-
Appellee Department of Human
Services